UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KIENA CLARK,

|  |  |
|---|---|
|  | Case No. 1:14-cv-330 |
|  | Dlott, J. |
| Plaintiff, | Bowman, M.J. |
| v. |  |

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Kiena Clark filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled.  *See* 42 U.S.C. §405(g).  Proceeding through counsel, Plaintiff presents two claims of error for this Court's review.  The Commissioner filed a response, to which Plaintiff did not reply.  For the reasons explained below, the ALJ's decision should be REVERSED in part, because it contains legal error and therefore is not supported by substantial evidence in the administrative record.

**I. Background**

In November 2009, Plaintiff filed an application for Supplemental Security Income benefits ("SSI"), alleging a disability onset date of December 1, 2000 due to low back pain, hip and knee pain, depression and anxiety.  Her application was denied initially and upon reconsideration, following which Plaintiff sought an evidentiary hearing.  A hearing was held in Cincinnati, Ohio on September 20, 2012 before Administrative Law Judge ("ALJ") Gregory Kenyon, at which Plaintiff appeared with counsel and presented testimony.  (Tr. 50-83).  A vocational expert also testified.  On November 28, 2012, ALJ

Kenyon filed a written decision in which he determined that, despite severe physical impairments as well as depression and anxiety, Plaintiff remained capable of full-time employment and therefore was not disabled.  (Tr. 22-44).

Born in 1965, Plaintiff was 34 years old on her alleged disability onset date, and was 46 years old at the time of the ALJ's decision, with a tenth grade application.  She has past relevant work as a deli counter clerk and a retail cashier, which she can no longer perform.  (Tr. 42).  She has not engaged in substantial gainful activity since her alleged disability onset date.  However, the ALJ found that Plaintiff's impairments did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, a determination that Plaintiff does not challenge here.  Instead, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, as further limited by the following:

> [S]he is limited to occasional crouching, kneeling, stooping, balancing, and climbing of ramps and stairs.  She must not crawl or climb ladders, ropes, or scaffolds.  She must not perform work around hazards such as unprotected heights or moving machinery.  She must not drive automotive equipment.  She is limited to occasional operation of foot controls with the dominant lower extremity. She is limited to performing jobs in which she would be permitted to use a cane for assistance.  She is limited to performing unskilled, simple, and repetitive tasks.  She may have occasional contact with co-workers and supervisors, but no public contact.  She must not perform work involving teamwork or tandem tasks.  She must not perform rapid production pace work or jobs involving strict production quotas.  She is limited to jobs that are performed in a relatively static work environment in which there is very little, if any, change in job duties or work setting from one day to the next.

(Tr. 28).

Based upon testimony from the vocational expert, the ALJ found that Plaintiff could perform a number of representative jobs, including ticket counter, addressing clerk, and packager.  (Tr. 43).  Those positions exist in significant numbers in the national economy, as well as in the Cincinnati region.  Therefore, the ALJ found that

Plaintiff was not under a disability between December 1, 2000 and the date of his decision. (Tr. 43-44).   After the Appeals Council denied Plaintiff's request for further review, she timely filed this judicial appeal.

In this appeal, Plaintiff does not dispute the ALJ's findings concerning her physical impairments, but argues that the ALJ erred by failing to find her disabled based upon her mental impairments.   More specifically, she argues that the ALJ erred in weighing the medical opinion evidence, and further erred in negatively judging her credibility.

## II.  Analysis

### A.  Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability."  *See* 42 U.S.C. §1382c(a).   Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if

3

substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  In other words, this Court must affirm even if the Court itself might have reached a different conclusion in reviewing the same evidence.  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.  A plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits.  20 C.F.R. §404.1512(a).

**B. Alleged Errors In Weighing Medical Evidence**

**1. Standards Applicable to Medical Opinion Evidence**

Plaintiff first argues that the ALJ inappropriately weighed the medical evidence. Five different mental health experts, including Plaintiff's treating psychiatrist, two examining consultants, and two non-examining consultants, offered opinions regarding Plaintiff's mental limitations. The experts differed widely on their opinions of the severity of Plaintiff's limitations. One non-examining consultant opined that Plaintiff has no severe mental health limitations at all, while her treating psychiatrist opined that her mental health limitations are so severe that she cannot meet competitive standards for full-time employment.

Plaintiff contends that in evaluating the various opinions, the ALJ erred by failing to give controlling weight to Plaintiff's treating psychiatrist and to one of the examining consultants, and by instead over-emphasizing the opinions of a second examining consultant. The treating psychiatrist and the first consulting psychologist, Dr. Ostrowski and Dr. Schmidtgoessling, both offered opinions that would have supported greater mental restrictions than those determined by the ALJ. However, the ALJ rejected both of those opinions in favor of the opinion of a second consultant, Dr. Sexton.

The relevant regulation regarding treating physicians provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004). The reasoning behind what has become known as "the treating physician rule" has been stated as follows:

5

> [T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)(quoting former 20 C.F.R. § 404.1527(d)(2)).  Thus, the treating physician rule requires the ALJ to generally give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians."  *See Blakley v. Com'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009).

In addition to the guidelines applicable to the evaluation of the opinions of treating physicians, the regulatory framework provides guidelines for the evaluation of the opinions of consulting physicians.  In general, the opinions of a consulting physician or psychologist who has actually examined the plaintiff will be given more weight than that of a non-examining consultant, although only treating physicians are entitled to controlling weight. *See* 20 C.F.R. §404.1527(c)(1) and (c)(2).

Viewed under the referenced legal framework, the ALJ's rejection of the opinions of a treating psychiatrist and an examining consultant invites close scrutiny. Nevertheless, the regulatory presumptions remain subject to individual variations. Thus, in *Blakley* the Sixth Circuit reiterated the principle that "[i]n appropriate circumstances," the opinions of non-examining consultants "may be entitled to greater weight than the opinions of treating or examining sources."  *Blakley*, 581 F.3d at 409, quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996).  While an ALJ may not rejected a treating physician opinion solely based on the conflicting opinions of non-examining consultants, *see Gayheart v. Com'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013), no reversible error occurs when an ALJ determines that a treating physician

6

opinion is not entitled to controlling weight because it is not well-supported, is internally inconsistent, and/or is inconsistent with the record as a whole.

As discussed below, I find reversible error in this case, and therefore recommend remand to the ALJ for further evaluation.

### 2.  Opinions Relating to Mental Limitations

Plaintiff's records reflect some treatment for depression and/or anxiety in 2004. (*See, e.g.* Tr. 216-222, emergency room visit for symptoms caused from abrupt cessation of Zoloft due to limited financial resources).  Additional treatment records from her primary care physician ("PCP") also suggest some treatment for depression and anxiety between October 2004 and 2007.  Nevertheless, evidence of treatment is somewhat sparse and sporadic, and there are no relevant records from November 2007 through September 2009.  (*See* Tr. 35).

In October 2009, Plaintiff's PCP referred her to Centerpoint Health for specialized mental health treatment, whereupon she was diagnosed with PTSD and major depressive disorder, recurrent episode, with a Global Assessment of Function ("GAF") score of 50.  (Tr. 241).  Dr. Ostrowski was the psychiatrist who supervised Plaintiff's treatment at Centerpoint.  He completed a mental impairment questionnaire on December 6, 2011,[1] in which he also assessed her GAF at 50.  (Tr. 458).  His mental RFC opinions reflect that they are based upon more than two years of counseling and medication management appointments of varying frequency, from weekly to monthly.

In evaluating the four broad functional areas commonly known as the "Paragraph B" criteria to determine whether Plaintiff met or equaled any mental disability Listing, Dr. Ostrowski opined that Plaintiff meets Listing level criteria because she suffers from

---

[1]Although Dr. Ostrowski completed his mental RFC assessment three days prior to Plaintiff's hearing, that evidence was not provided to the ALJ until shortly after the hearing.

"extreme" restrictions in activities of daily living and social functioning, has "marked" difficulties in maintaining concentration, persistence or pace, and would be absent more than four days per month as a result of those impairments.  (Tr. 461-462).   Dr. Ostrowski also found that Plaintiff met the Paragraph C criteria of Listings 12.04 and 12.06, meaning that Plaintiff's mental limitations were so severe that even a minimal increase in demands or change in her environment would cause her to decompensate, and that she had a history of one or more years demonstrating an inability to function outside of a highly supportive living arrangement.  (Tr. 462).

Dr. Ostroski offered multiple opinions concerning Plaintiff's functional limitations, stating that she was "[c]onfined to her apartment" and "[f]earful of public setting[s]," (*id.*), and that she would be "unable to meet competitive standards" in 9 different work-related areas that he evaluated.   Additionally, he found her to be "seriously limited" in 5 more areas out of the 16 total areas of evaluation for the performance of "unskilled" work.  (Tr. 459-460).  He determined she was unable to meet competitive standards in using public transportation or traveling to unfamiliar places, and "seriously limited" in her abilities to interact with the general public or maintain socially appropriate behavior.  (Tr. 461).

In evaluating the opinion evidence, the ALJ gave "little weight" to the opinions of Dr. Ostrowski that Plaintiff met or equaled Listing 12.04 or Listing 12.06 either under Paragraph B or Paragraph C criteria.  The ALJ also gave "little weight" to any of Dr. Ostrowski's opinions concerning Plaintiff's functional limitations, finding those opinions to be "inconsistent with the medical evidence of record, including [one-time consultant] Dr. Sexton's objective findings."  (Tr. 41).  The ALJ reasoned:

> [T]he claimant's treatment records from Centerpoint do not adequately support Dr. Ostrowski's assessment.   The level of acute depressive psychosis described by Dr. Ostrowski in his assessment is inconsistent with the claimant's daily activities, which include reading, talking on the

> telephone, and performing household chores.   Dr. Ostrowski's
> assessment is also not supported by objective findings that corroborate
> the level of psychopathology described in the check-off assessment.

(Tr. 41).   In addition to Centerpoint records and Dr. Ostrowski's December 2011 opinions, the record includes earlier psychological reports from two examining consultants and mental RFC assessments from two non-examining consultants.

On February 18, 2010, Dr. Nancy Schmidtgoessling conducted a one-time psychological examination and on September 14, 2010, Dr. Richard Sexton conducted a second examination.   During the first consulting examination, Dr. Schmidtgoessling diagnosed depressive disorder, panic disorder with agoraphobia, PTSD, and generalized anxiety disorder.   She assessed Plaintiff's GAF at 48, and concluded that Plaintiff was "markedly" impaired in her ability to relate to others, and in her ability to tolerate normal stress and pressures of day to day work.   By contrast, she found only "mild" impairment in Plaintiff's ability to understand, remember and follow instructions, and "moderate" impairment in her ability to maintain attention, concentration, persistence, and pace.   (Tr. 293).   The ALJ accepted the latter two findings, but rejected Dr. Schmidtgoessling's opinions that Plaintiff was markedly impaired in any area, reasoning that the "marked" restrictions were "inconsistent with the claimant's treatment notes which demonstrate moderate-level depressive symptoms related to financial stressors," and only "isolated auditory and visual hallucinations, which, over the course of her treatment, appear transient in nature."   (Tr. 40).   The ALJ also reasoned that Plaintiff has "never required hospitalization for psychosis."   (*Id.*).

Seven months after Dr. Schmidtgoessling assessed Plaintiff with "marked" limitations in social functioning and in her ability to tolerate work stress, with a GAF of 48, Dr. Sexton examined Plaintiff.   In contrast to Dr. Schmidtgoessling, Dr. Sexton found

Plaintiff to be only "mildly" impaired in all four Paragraph B areas, and assessed her GAF to be significantly higher, at 62.  (Tr. 372-373).  The ALJ gave "more weight to Dr. Sexton's assessment" on grounds that "it is more consistent with the weight of the medical evidence of record, including the level of treatment the claimant received at Centerpoint."  (Tr. 40).

The record also contains separate mental RFC assessments completed by two non-examining consultants, Dr. Patricia Semmelman and Dr. Douglas Pawlarczyk, who reviewed Plaintiff's records and completed their assessments shortly after the two consulting examinations.

Dr. Semmelman's RFC assessment, dated March 29, 2010, was based partly on the examination of Dr. Schmidtgoessling, as well as her review of other medical evidence of record.  Dr. Semmelman assessed Plaintiff with "moderate" limitations in social functioning, disagreeing with Dr. Schmidtgoessling's "marked" finding.  Dr. Semmelman agreed that Plaintiff had moderate limitations in maintaining concentration, persistence or pace, but found only "mild" restriction in activities of daily living, again in contrast to Dr. Schmidtgoessling's greater restrictions. (Tr. 337).  Dr. Semmelman explained that she believed Plaintiff's statements to Dr. Schmidtgoessling at the consulting examination were "inconsistent with" other medical evidence of record.  For example, Plaintiff reported treatment for six years, but Dr. Semmelman believed the records showed she was only seen briefly in 2004-2005, with a first referral for specialized treatment late in 2009.  (Tr. 343).  Plaintiff described frequent "panic attacks" but Dr. Semmelman found "no mention of panic" in her mental health records.  Plaintiff reported being afraid to leave her house for the past four years, but Dr. Semmelman also found no evidence of that.  On her activities of daily living report,

Plaintiff stated she left her home 3-4 times per week "which is actually more than what she indicated in 2005." Moreover, notwithstanding complaints of anxiety in the medical records, "there is no dx of any kind of agoraphobia," and her primary care physician's records "shows she goes for walks a few times a week for exercise." (Tr. 343).

Dr. Semmelman also noted that Plaintiff "is now reporting [that] she has OCD symptoms" which was not reflected in her treatment records. As a further basis for discounting Plaintiff's reports and Dr. Schmidtgoessling's more severe limitations, Dr. Semmelman concluded:

> [Plaintiff] is able to take the bus or [have] others give her rides. The clt reported a number of classic PTSD [symptoms] to [Dr. Schmidtgoessling], yet no evidence of any of these [are] in the [medical evidence of record].... The clt told [Dr. Schmidtgoessling] she has dreams about her abuse but there are no other symptoms of PTSD other than that. The clt denied any abuse hx to the PCP in 9-09. The clt told [her mental health counselor] she feels at times like someone walks past her in her apartment, yet did not report this to [Dr. Schmidtgoessling] but reported to [her] she hears her name called (which is not a hallucination) and sees something out of the corner of her eye. The clt presented with a jiggling foot but neither the DO nor the MHC show any kind of agitation. The clt reported to [Dr. Schmidtgoessling] she interacts with her mother and children. The MHC shows that the clt has friends with whom she maintains regular contact, interacts with her grandchildren and children, her grandmother. She goes out to lunch with her mother at times. The clt reported on her adl she relates fine with others. She also enjoys reading and watching TV. The clt denies any [drug and alcohol] for years, but the MER from 6-04 shows she was dx with Alcohol Abuse along with depression. There was no evidence of any kind of PTSD. The 9-09 PCP shows the clt is stressed about her son going to Iraq but does not bring this up at the MRC or at the [consulting exam]. The clt's social skills are mild to moderately impaired at times. Given all these inconsistencies, no weight is given to the DX of OCD or to the dx of agoraphobia. Also lesser weight is given to the functional conclusions of [Dr. Schmidtgoessling] for these same reasons. She can interact occasionally and superficially and receive instructions and ask questions appropriately in a smaller or more solitary and less public to nonpublic work setting. She can cope with the ordinary and routine changes in a work setting that is not fast paced or of high demand.

(Tr. 343-344). The ALJ gave "moderate weight" to Dr. Semmelman's RFC findings, stating that he "took [them] into account" when formulating Plaintiff's mental RFC

11

limitations.  (Tr. 40).

The ALJ neglected to discuss the fifth mental health opinion in the record, that of Dr. Pawlarcyk, who completed his RFC assessment following Dr. Sexton's consulting examination.  I find that omission to be harmless error in this case, to the extent that Dr. Pawlarcyk opined that Plaintiff's psychological impairment was "not severe."  (*See* Tr. 395).   No other mental health expert concluded that Plaintiff's impairment was not severe, and the ALJ specifically found both her depression and anxiety to be severe.

I find no error in the ALJ's rejection of Dr. Ostrowski's opinion that Plaintiff met or equaled a Listed impairment.  Plaintiff does not argue in this proceeding that she did meet or equal Listing 12.04 or 12.06, and substantial evidence supports the ALJ's determination that she did not.

On the other hand, I find significant error concerning the ALJ's rejection of Dr. Ostrowski's opinions concerning the severity of Plaintiff's functional limitations, and the ALJ's over-reliance on the much earlier opinion of one-time examiner Dr. Sexton and non-examining consultant Dr. Semmelman, both of whom lacked access to Plaintiff's complete records.   The ALJ's analysis in this case contradicts the Sixth Circuit's guidance in both *Blakley* and *Gayheart*.

In *Blakley,* the court reversed on grounds that the state consultants did not have the opportunity to review "much of the over 300 pages of medical treatment...by Blakley's treating sources," and the ALJ failed to indicate that he had "at least considered [that] fact before giving greater weight" to the consulting physician's opinions.  *Blakley*, 581 F.3d at 409 (*quoting Fisk v. Astrue*, 253 Fed.Appx. 580, 585 (6th Cir. 2007)).   Under *Blakley*, then, an ALJ may choose to credit the opinion of even a non-examining consultant who has failed to review a complete record, but he should

12

articulate his reasons for doing so.  If he fails to provide sufficient reasons, his opinion still may be affirmed if substantial evidence supports the opinion and any error is deemed to be harmless or *de minimis*.

Here, the ALJ failed to explicitly acknowledge that the consultants on whom he chiefly relied (Sexton and Semmelman) rendered their opinions without reviewing the complete record, including most of the critical records from Centerpoint and Plaintiff's treating physician's opinions.  This error was not entirely harmless or *de minimis*, except – as explained below -  with respect to Plaintiff's disability status prior to October 2009.

Dr. Semmelman evaluated the records early in 2010.  Plaintiff was not referred to Centerpoint until October of 2009, and was not initially seen by Dr. Ostrowski until December 2009.  Thus, Dr. Semmelman did not have access to the majority of Plaintiff's mental health treatment records.  Most of Dr. Semmelman's criticisms of Plaintiff's diagnosis and reported symptoms (of agoraphobia, PTSD, and OCD) were based upon the lack of such reported diagnosis or symptoms in the limited treatment records to which she had access. [2] As a result, she heavily discounted the more serious limitations and findings reported by Dr. Schmidtgoessling in her consultative clinical examination.  The later Centerpoint records, as well as Dr. Ostrowski's December 2011 mental RFC report, provide more evidence to support Plaintiff's reported symptoms of obsessive thoughts and additional mental health diagnoses, including agoraphobia, that were found by Dr. Schmidtgoessling.

The ALJ additionally failed to acknowledge that Dr. Sexton, who examined Plaintiff in September 2010, had access to fewer than half of her mental health

---

[2]Some of the criticisms levied by Dr. Semmelman were questionable for other reasons.  For example, although she discredited Plaintiff's report that she had been in treatment for about six years, Plaintiff's medical records reflect that she was prescribed medication for anxiety and depression for a number of years by her PCP prior to being referred to Centerpoint.

treatment records,[3] and no access to her treating psychiatrist's opinions. The ALJ stated that Dr. Sexton's assessment was "more consistent with the weight of the medical evidence of record, including *the level of treatment* the claimant received at Centerpoint." (Tr. 40, emphasis added). It is unclear what the ALJ meant by reference to the "level of treatment" at Centerpoint, since Plaintiff's records reflect a relatively high rate of frequency in Plaintiff's outpatient visits there, from monthly to as often as weekly. (Tr. 458). Just prior to the reference, the ALJ reasoned that Plaintiff's "occasionally noted isolated auditory and visual hallucinations…appear transient in nature…[and s]he has never required hospitalization for psychosis" (Tr. 40). However, Plaintiff does not appear to claim disability from psychosis. More importantly, while the ALJ might have juxtaposed this analysis unintentionally, there is no requirement that a plaintiff receive inpatient treatment in order to be found to be disabled from mental limitations. In any event, the undersigned concludes that the ALJ violated *Blakley* by failing to acknowledge that the consultants on whom he chiefly relied lacked access to a significant portion of Plaintiff's mental health records.

Additionally, the ALJ erred under *Gayheart*, at least in part, to the extent that he appears to have discounted the treating psychiatrist's opinions by finding Dr. Ostrowski's opinions to be inconsistent with the much earlier opinions of the consulting psychologists, particularly that of Dr. Sexton. (*See, e.g.*, Tr. 41: "The undersigned accords little weight to the assessment of Dr. Ostrowksi, as it is inconsistent with the medical evidence of record, including Dr. Sexton's objective findings.").

The ALJ did review the Centerpoint records that he received after the hearing, and included references to some of those records in his opinion. (*See e.g.*, Tr. 36, 37,

---

[3]The ALJ also lacked access to most of the records at the hearing, since Plaintiff's counsel did not submit most Centerpoint records (August 2010 through December 2011) until shortly after the hearing. (Tr. 464)

14

40).   But while the ALJ focused on records that reflected some slight or "mild" improvements, the undersigned notes that the records reflect not only a high frequency of therapy visits,[4] but also frequent medication adjustments by Dr. Ostrowski, usually in the form of changes or increases in dosages in an attempt to decrease Plaintiff's persistently serious symptoms.   While most of Dr. Ostrowski's hand-written notes are difficult to decipher, the ALJ glosses over references that reflect more debilitating symptoms.  (*See, e.g.*, Tr. 475, 7/20/11 record reporting that Plaintiff "stays in bed or is tearful most of the day," and only on a good day can "find her way out of the house."). The Commissioner, like the ALJ, focuses on records that reflect that Plaintiff was able to go out to see her mother and/or occasional ability to get out to see a small number of other relatives.  Given the referenced *Blakley* and *Gayheart* errors, which alone require remand since they are not harmless (except as noted), the referenced limited "positive" portions of the record do not provide sufficient evidence on which the ALJ's non-disability finding can be affirmed.   Thus, taken as a whole, the errors in the ALJ's analysis amount to a lack of "good reasons" for failing to provide Dr. Ostrowski's opinions "controlling" weight.  *See Rogers v. Commissioner*, 486 F.3d 234, 242-243 (6th Cir. 2007); *see also Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009).

The one caveat to the above analysis is that, while finding remand to be appropriate to reconsider the extent of Plaintiff's psychological impairment following her referral to Centerpoint for specialized treatment in October 2009, the undersigned finds no more than harmless error concerning Plaintiff's mental functional limitations prior to October 2009.  Plaintiff was prescribed medication by her PCP sporadically for anxiety and depression from 2004-2007, with no relevant treatment records from November

---

[4]Although the record reflects that Plaintiff attended additional therapy sessions at Centerpoint with Gerri Wayland, PC (*see* Tr. 500), it is not clear to the undersigned that all of the therapist's records (as opposed to Dr. Ostrowski's records) were included in the administrative record.

2007 through September 2009.  The scant records prior to Plaintiff's referral to Centerpoint do not support greater functional limitations than previously determined by the ALJ.  Therefore, the beginning period of disability to be reconsidered on remand is appropriately limited to October 2009.

### 3. Credibility

Plaintiff's disability claim rests upon complaints of physical and psychological impairment that are not fully supported by objective evidence.  Subjective complaints of pain may support a claim for disability.  *See Duncan v. Sec'y of HHS*, 801 F.2d 847, 852 (6th Cir. 1986).  However, in cases in which complaints of disabling pain are not well-supported by medical evidence, the credibility of the claimant is often critical.  *See Tyra v. Sec'y of HHS*, 896 F.2d 1024, 1030 (6th Cir. 1990).

Here, the ALJ found that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms.… the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the RFC determined by the ALJ.  (Tr. 30).  Plaintiff challenges the ALJ's negative assessment of her credibility on grounds that the ALJ used "boilerplate language" and "circular logic*." See Dragon v. Com'r of Soc. Sec.*, 470 Fed. Appx. 454, 466 (6th Cir. 2012)(pointing out ALJ's "circular" reasoning to the extent that the ALJ found the plaintiff's testimony to be credible only to the extent that it agreed with the ALJ's own conclusion).  Plaintiff argues that the ALJ erred in part by stating his assessment of Plaintiff's credibility *after* determining Plaintiff's RFC instead of the other way around - determining her credibility first, and then making his RFC finding.

Last, Plaintiff complains that the ALJ improperly used Plaintiff's "activities of daily

living," such as talking on the phone, as a basis for discounting her credibility as well as a reason to reject Dr. Ostrowski's opinions.   Plaintiff protests that her telephone conversations were initiated by two friends to her, not calls placed by her, and her few "appointments" requiring her to leave her home were for medical treatment.   Plaintiff testified that attending those appointments was a "traumatic experience" for her, that she was bothered by using public transportation, and that she needed days of mental preparation to be able to attend her appointments.

An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).   Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).   Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).

The ALJ explained some of his concerns about the Plaintiff's credibility:

> The record shows the claimant has some limitations resulting from degenerative disc disease of the lumbar spine; however, it does not support the severity of limitations alleged by the claimant.  Additionally the record shows the claimant occasionally reported some improvement with conservative treatment.

(Tr. 30).   As stated above, this appeal does not challenge the ALJ's findings concerning Plaintiff's physical limitations.   For that reason, I find no error to the extent that the ALJ did not find Plaintiff's allegations regarding her physical limitations to be fully credible.

I also find no reversible error in the ALJ's alleged use of "boilerplate" language,

or "circular" logic in finding Plaintiff's allegations to be inconsistent with the RFC that he determined.  The unpublished *Dragon* case on which Plaintiff relies does not suggest that trial courts must reverse any time ALJs use "boilerplate" language. Similarly, the order in which the ALJ articulated his findings (RFC first, followed by a statement concerning Plaintiff's credibility) does not provide grounds for remand.  Countless ALJ opinions use similar analysis, in a similar "standard" or "boilerplate" manner and sequence.  Considering the fact that each ALJ's opinion must adhere to a strictly regulated sequential analysis, and must contain a number of defined components including a credibility determination, it is not surprising that many of the opinions rely on somewhat "boilerplate" language rather than trying to reinvent the wheel with original language and syntax.  In short, the ALJ's use of a modicum of standard language would reflect error only if the analysis itself was devoid of individual case details.  In the present case, the ALJ's 22 page single-space typed opinion is brimming with the type of detailed citation to the record that confirms the ALJ's close analysis of the case before him.

Finally, the ALJ did not err by considering Plaintiff's daily activities in making his credibility finding.  The regulations specify that an ALJ may take such activities into account.  On the other hand, because remand for reconsideration of Plaintiff's psychological impairment is already required to correct legal error, and such error may have impacted the ALJ's determination of Plaintiff's credibility concerning her psychological impairment, it is appropriate for the ALJ to reconsider Plaintiff's credibility concerning her psychological limitations.

### III.  Conclusion and Recommendation

A sentence four remand under 42 U.S.C. §405(g) provides the required relief in

cases such as this one, where there is insufficient evidence in the record to support the Commissioner's conclusions due to legal error, and further fact-finding is necessary. *See Faucher v. Secretary of Health and Human Servs.,* 17 F.3d 171, 174 (6th Cir. 1994) (citations omitted).

For the reasons discussed above, **IT IS RECOMMENDED THAT:**

1. The decision of the Commissioner to deny the Plaintiff SSI benefits should be **REVERSED** and this matter should be **REMANDED** under sentence four of 42 U.S.C. §405(g);

2. As no further matters remain pending, this case should be **CLOSED.**

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KIENA CLARK,

                                     Case No. 1:14-cv-330
                                     Dlott, J.
              Plaintiff,                     Bowman, M.J.
     v.

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).